[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The parties were married on August 20, 1989. It is the third marriage for the defendant ("husband") both previous marriages having ended in divorce. The husband is the father of three adult sons ranging in age from 40 to 44 all of whom assist him in his business. The wife was married for a brief period once before and that marriage also ended in CT Page 10725 divorce. This matter was tried over the course of six days, and the court heard from numerous witnesses, both fact and expert, in addition to the parties themselves. The case has been pending for two and half years, and all this time the parties have been living under the same roof
The wife is 53 years old and has a bachelor's degree in addition to real estate licenses in the states of New Jersey and Connecticut. She testified that while she has never actively pursued a career in real estate, nevertheless, she has kept up with her certification and listed herself with the William Pitt Agency in the fall of 1999. She has worked outside of the home for most of her life for a variety of employers. The parties met in 1982 and dated until their marriage in 1989. She went to work for the husband in November of 1982. At that time he had a small architectural firm employing about four people. The wife testified that when she worked for her husband she performed duties including bookkeeping, payroll set-up, purchasing, administrative work and office management. She indicated that her income rose from $20,000 in 1982 when she was hired, up to $30,000 at the time she left in 1986. She described the growth in her husband's business in terms of an increasing client base and the fact that there were twelve employees when she left. In addition, she feels that she contributed to her husband's business in that she traveled with him to conventions and went to dinners and other company functions. She left that job in 1986 after having a dispute with her husband over some work related issue. She returned to New Jersey where she held a succession of jobs for approximately six months each, losing each not for want of her skills, but rather as a result of changes within the corporate structure. Prior to their marriage, the husband indicated that he did not want her to work and that in his words "he had enough money for the two of us" and that she had enough to do caring for her mother. To date, the wife has made no effort to obtain any employment outside the home.
She describes her health as "generally good." However, she suffers from an irritable or spastic colon, and she had an ovarian tumor removed in 1994. In September 2000 she had uterine polyp removed. In addition, she is currently being treated for "rosatia." However, her most significant health problem is her teeth. In 1994 she had all her teeth removed, and two years later had eleven implants placed in her lower jaw. This was a result of a periodontal problem involving significant bone loss. She now needs work on the upper jaw, and estimates that it will take three years. She has already spent $63,000 for the lower implants and related dental work, and she estimates for the future would be approximately $64,000. In addition, she currently owes $8,000 to Dr. Zimmer for past dental work.
At the time of the marriage, the parties had no pre-nuptial agreement, CT Page 10726 although it is apparent to the court that at least the topic had been discussed between them since some evidence of that was introduced at trial. They prepared and exchanged financial affidavits in July 1989 and both of which entered as exhibits in this matter (Plaintiff's Exhibits 3 and 4).
The husband is 62 years old and describes his health as "reasonably good." Although he had angioplasty and a stent implanted two years ago and is currently on medication for high blood pressure. He attended Columbia University, however, he never finished. He is a licensed architect and has been practicing that profession for quite a number of years. At first he worked for a firm called Perkins Will but left in 1981 to start his own firm called AHSC Architects. Their headquarters is in Tarrytown, New York, and they concentrate in the area of hospital additions, laboratories and other health care facilities. His business has grown from 4 to 50 employees. He later acquired a European firm (McLellan Copenhagen, LLC), and he has consulting locations in Coopertino, California and Seattle, Washington. Both of these businesses operate under an umbrella organization AHSC Group, LLC which provides management services. His business is quite successful and in most years has been profitable grossing anywhere from three to six million dollars. The year 1999 was aberrational and the firm lost a considerable amount of money. He conducts business all over the world.
The wife indicated that she had brought approximately $290,000 in assets to the marriage. At that time the husband had ownership of a home in the Riverside section of Greenwich located at 45 Meyer Place, as well as a home at 190 Byram Shore Road in Greenwich. In addition, the husband had considerable assets totaling approximately ($3 million). During the marriage, the wife inherited from her mother certain assets which she currently maintains in joint names with right of survivorship with her brother. She conceded during testimony that if something would happen to her, the assets would go directly to her brother, and that no provision has been made for Mr. Kenney.
Prior to their marriage, the parties agreed that they would live in the Byram Shore Road home, and that they would undertake some major renovations to it. The house is on the Bryram River side of a private road. The husband purchased the property in June 1987 for the sum of $475,000 with a mortgage in the amount of $350,000 and a $125,000 down payment from his funds. At the time of the marriage, he indicated that the value was $725,000 with a mortgage balance of $310,000 (Plaintiff's Exhibit 3). He moved into the premises in 1988 and according to his testimony, he spent an additional $225,000-$250,000 in renovations. Considerable testimony was elicited not only from experts with regard to the current fair market value of the property, but also as to the efforts CT Page 10727 and expenditure by the parties with regard. to the renovation. It is understandably an emotional issue with the wife. Based upon the testimony of the parties there is no doubt that virtually all of the monies expended by the parties in the construction and remodeling came from the husband by way of either his independent assets, his income, or a construction mortgage (later converted to a conventional mortgage). During the period 1996 to 1998 the husband spent between $600,000 and $700,000 on the project. The wife offered considerable testimony not only on her behalf, but through fact witnesses, mainly the various contractors who worked on the project. The wife contends that she, in fact, acted as the general contractor, supervising the work on a daily basis, making those day to day decisions necessary to move the work forward, and dealing with all of the contractors. The photographs before and after of this 100 year old house show a truly amazing transformation. However, for his part the husband testified that he also had a role not only in the design, but also in the signing of several of the contracts with the subcontractors as well as decisions regarding some of the basic structural aspects of the construction. There is no doubt in the court's mind that both parties have contributed significantly of their time and effort to the project. In addition to the house itself there was testimony to the fact either shortly before or just after the marriage the husband improved the property with the addition of a new dock into the Byram River, as well as a $70,000 Japanese garden covering one quarter of an acre. Quite understandably, each party wants the home, and each wants a considerable amount of the property and furnishings within the home. The court heard from three appraisers as to their estimates of value and has the benefit of their appraisals as exhibits herein. After hearing the testimony of the experts, the parties themselves and reviewing their respective reports, the court finds that Mr. Castiglia's opinion was somewhat flawed, in particular due to a poor choice of comparable sales. In addition, the husband himself has attempted to stress the view from the property which includes a power plant and what would appear to be an abandoned factory across the river. He also emphasizes the closeness to I-95 and the noise factor. The wife, obviously, downplays all of those aspects. The court finds the fair market value to be $2,750,000.
Also at the time of the parties marriage, the husband had an interest in a property at 45 Meyer Place in Riverside, Connecticut, which he had purchased in 1972. For a short period after the marriage, this was occupied not only by the wife's mother until her death, but also at various times by one or more of the husband's sons. The house has also been renovated with siding and some other improvements. However, the wife has indicated that the property is undesirable because of its location abutting Interstate-95. The wife testified that she would like the property sold. In addition to her quarrel with the location, the wife CT Page 10728 contends that the large mortgage to the husband makes it unsaleable. This argument is without merit. In fact, the parties have entered a stipulation that the property is worth $535,000. The wife testified that shortly before the marriage, the husband explained to her that for tax reasons he had to place the Meyer Place property in her name. Based upon the advice of his tax advisors, he advanced to her the sum of $123,000 so that she could "buy" his interest. At the same time, he also prepared a promissory note in the amount of $368,000 and a mortgage deed securing the note running from her to him bearing interest. Currently the property remains titled to her and the mortgage was recorded on the land records. All during the marriage up to the point of the filing for dissolution, the husband never asked the wife for the payment of any interest on this loan. Since that time he has made demand upon her for interest which now has accrued to an excess of $70,000. The husband has asked the court in his Claims for Relief to leave the house in the wife's name and indicates that he would be willing to forgive the mortgage and interest, leaving her with a considerable income producing asset. For her part, she has indicated to the court that she has no interest in this property. It is interesting to note that at the time of the parties' marriage and exchange of affidavits, the wife did not list this property on her affidavit. However, it is of equal interest that subsequent to the filing of the divorce action, the wife has not paid taxes on the property and has made no effort to seek a fair market rental for the property. The parties stipulated that fair market rental in fact would be $4,300.00. However, instead of maximizing her return by leasing the premises for fair market rent, she has hired house sitters for a nominal sum.
The wife introduced expert testimony through Dr. Lester Barenbaum with regard to the evaluation of the husband's interest in his business and the husband offered testimony through Mark Harrison, C.P.A. which contradicted it in part. The controversy with regard to the business centered largely around a sizeable deferred compensation owing to the husband of approximately $950,000. According to the testimony of the husband this is unfunded and is a debt of the corporation. Dr. Barenbaum indicated that he felt a ready, willing and able buyer would not have a problem with that item. Both experts indicated a business is bought on the basis of cash flow, however, each differed with regard to how that un-deferred compensation affected cash flow, if at all. Dr. Barenbaum testified that the value of the business is $1,031,600. Mark Harrison indicated that a ready willing and able buyer would pay less on account of the impact of the deferred compensation account on cash flow. This court agrees. The court notes that at the time of the marriage, the husband listed the book value of the business (assets minus liabilities) as to the value of his business. The court notes that both experts found that book value is not an accurate measure. CT Page 10729
Another bone of contention centers around the husband's estate planning over the course of the marriage. When the parties were first married the husband had made some provision for his sons by way of an insurance trust. The wife testified, and the husband corroborated her testimony, that each of them explored, separately and together, the topic of an estate plan for the husband. This included a consultation with professionals as well as the attendance at seminars. In addition to his Will and the trust for his children, the husband indicated to the wife that he had set aside a million dollar life insurance policy for her benefit in the event of his death. However, in late 1998 at a closing on the mortgage loan for converting the construction loan to a conventional mortgage, the wife found out that the husband in fact had conducted some estate planning without her knowledge. of particular concern for her was the preparation of a qualified personal residence trust ("QPRT") and he transfer of the Byram Shore Road property to it, as well as a revision to the insurance trust for "the benefit of the children. In brief, the QPRT provided if the husband survived twelve years there would be a continuing trust for the benefit of the wife and the three children. At this time the wife expressed some considerable concern and had asked the husband for copies of the documents and to meet with his estate planner Attorney B. Cort Delaney. The husband agreed to this and Attorney Delaney sat down with both parties and explained the circumstances. The wife also asked the husband to check into the life insurance situation for her benefit. At this time he indicated to her that through an oversight the insurance policy had been made payable to his estate and not to her, and that he had rectified that immediately. In sum, a review of the documents indicated that while the husband had expressed his desire that the wife remain in the house during her lifetime (following his death) there were no guarantees this would happen. It was at this time that things began to unravel and shortly thereafter, the wife filed first for a legal separation and then for a dissolution of marriage.
As far as the court can tell from the testimony of both parties, neither party was unfaithful, and both would have remained in the relationship but for this circumstances surrounding the estate planning. The husband, in fact, testified up to the filing, and even after, he still loved his wife and wanted to continue in the relationship. The wife, for her part felt betrayed and very insecure which point was made very clear to the court over the course of the trial. In fact, the wife's emphasis on the financial aspects of the marriage and her need for financial security, has led the court to come to the inescapable conclusion that these elements have been her primary focus throughout the entire relationship. Again, over the course of the trial, the court heard testimony with regard to the generosity that the husband showed toward his three sons. He gave two of them jobs, and regular gifts and at one point one or both lived in the house in Riverside. They are the natural CT Page 10730 objects of his bounty, and this court finds that it was perfectly logical that he would provide for them. He testified himself and also offered testimony through Attorney Delaney that he had no underhanded purpose in constructing the estate plan and revising it. His instructions to Attorney Delaney were clearly to do this in the "most tax efficient manner" possible. The wife wishes to attribute a totally bad faith motive to the husband for which the court can find no credible basis. In a last ditch attempt to mollify his wife, the husband testified that they both went on a trip, and that he had attempted in vain to discuss with her and to explain to her the reasons for the estate plan. It is not clear to the court whether or not the wife expressed any concerns with regard to her financial insecurity prior to the closing in 1998. However, the husband testified that the marriage showed signs of some strain as early as 1997. (Plaintiff's Exhibit 55.) In addition, the wife testified that the husband had contacted genital herpes during the marriage and that she believed that he had an affair. The court heard no credible evidence to support this claim.
At the time of trial, the husband stipulated that he owed approximately $23,000 in past due alimony, and that he would pay in full by early May 2001.
 FINDINGS
The Court, having heard the testimony of both parties, and having considered the evidence presented at hearing, as well as the factors enumerated in Sections 46b-40, 46b-51, 46b-62, 46b-63, 46b-81, and 46b-82
of the Connecticut General Statutes, hereby makes the following findings:
1. That it has jurisdiction.
 2. That the allegations of the complaint are proven and true.
 3. That the marriage of the parties has broken down irretrievably, and that while ample evidence exists that both parties have contributed to said breakdown, the catalyst for institution of the present action was the wife's preemptive institution of the present action in reaction to her perceived future financial insecurity.
 4. That prior to the marriage the wife was regularly and gainfully employed on a full time basis; that she has a college degree; that she is qualified to CT Page 10731 sell real estate in Connecticut; that she has an earning capacity of at least $30,000 per annum; that given her age and the state of her health she is not prevented from obtaining gainful full time employment in the future; and that it is therefor equitable and appropriate that the court award time-limited alimony.
 5. That based upon the testimony and evidence, the husband's average annual earnings from employment (W-2) for the period 1989 through 1999 (11 years) are approximately $486,000; and that it is equitable and appropriate to base any financial orders thereon.
 6. That the husband purchased the real property located at 190 Byram Shore Road, Greenwich, Connecticut, in June 1987 for the sum of $475,000 together with a mortgage in the amount of $350,000, and a down payment in the amount of $125,000; that said purchase was made prior to the marriage of the parties with the husband's own funds; that prior to their marriage the husband made improvements to the premises with his own funds amounting to $225,000-$250,000; that during the marriage the husband used an additional $600,000 to $700,000 of his own funds (including the net proceeds from a new mortgage) to improve the home; that the fair market value of the property is $2,750,000; that there is a $500,000 mortgage thereon; and that the current equity in the premises is $2,250,000.
 7. That the real estate located at 45 Meyer Place, Greenwich, Connecticut was owned by the husband at the time of the marriage; that the improvements to the property were paid for by the husband; that per Stipulation of the parties the fair market value of the property is $535,000; that the transfer of title to the wife (including the mortgage in the amount of $368,000) was made for tax purposes; and that in accordance with the further stipulation of the parties it has a fair market rental value of $4,300.00 per month.
 8. That the court has considered the testimony of the CT Page 10732 parties, as well as the testimony of Attorney B. Cort Delaney; that the husband could have been more forthcoming with the wife with regard to the more recent aspects of his estate planning; that the wife knew or should have known that the husband had included his sons from a previous marriage in said estate planning; that during the course of the marriage, the husband had a pattern of gifting to his children which fact was known to the wife; that title to the real property at 190 Byram Shore Road, Greenwich, Connecticut, was in the sole name of the husband at the time of the marriage; that the transfer of said premises to a Qualified Personal Residential Trust (QPRT) was made prior to and not in contemplation of the present action, that it was made for a legitimate estate planning purpose and without an intent to defraud the wife of any interest therein; that the husband had otherwise adequately provided (or intended to provide) for her with life insurance on his life; and that the husband's actions in this regard do not amount to a fraudulent conveyance.
 9. That the husband brought to the marriage certain assets having a value of approximately $3,000,000, including, but not limited to two residences, securities, his business, retirement funds, automobiles, and home furnishings and artwork.
 10. That the wife brought to the marriage certain assets having a value of approximately $290,000, including, but not limited to securities and retirement funds.
 11. That when the wife moved into the premises at 190 Byram Shore Road, Greenwich, Connecticut, in 1989 it was already occupied by the husband; that a major renovation/addition was made thereto between 1996 and 1998 costing between $600,000-$700,000; that the funds for the later improvements came almost entirely from the husband's funds; that while both parties made substantially equal contributions to the interior and exterior design, decoration, and construction thereof, it CT Page 10733 is equitable and appropriate that the title to same remain with the husband free and clear of any claims by the wife; that to force a sale of the premises would not serve the ends of justice; and that the wife should receive other marital assets in lieu of any claims thereto.
 12. That during the pendency of the marriage the wife received her share of an inheritance from her mother which has a value of approximately $600,000; that the title to these assets are held jointly in survivorship with her brother; that the husband has made no contribution to the maintenance and preservation of these assets; and that it would be equitable and appropriate that the wife keep these assets free and clear of any claims by the husband.
 13. That based upon the testimony and evidence, taking into account the deferred compensation account, the fair market value of the husband's interest in AHSC and affiliated entities is approximately $900,000.
 14. That prior to the marriage the wife was employed by the husband at his firm AHSC to assist in the office; that her contributions to the management and growth of his business during that period were de minimus and more than offset by the salary which she received; and that it is equitable and appropriate that the husband is entitled to this asset free and clear of any claims by the wife.
 15. That at the time of the marriage, both parties had retirement assets; that the husband's retirement assets have experienced substantial growth during the marriage; and that it is equitable and appropriate that the wife share in a portion of that growth.
 16. That the attorneys fees and costs incurred by the wife as evidenced by the affidavit of counsel are fair and reasonable; and so that the purposes of the award of this court is not undermined, it is equitable and appropriate that the husband pay a portion of the wife's counsel fees. CT Page 10734
 ORDER
IT IS HEREBY ORDERED THAT:
 1. The marriage of the parties is hereby dissolved, and they are each hereby declared to be single and unmarried.
 2. Commencing September 1, 2001, and monthly thereafter, the husband shall pay to the wife the sum of FIVE THOUSAND ($5,000) DOLLARS per month as and for periodic alimony, until the death of either party, the remarriage of the wife, or August 31, 2004, whichever shall sooner occur. The term of alimony shall not be modifiable by either party.
 3. The husband shall have exclusive possession of the real property located at 190 Byram Shore Road, Greenwich, Connecticut, and he shall retain sole title thereto free and clear of any claims by the wife, subject to any existing mortgages and home equity lines. The wife shall vacate the premises within thirty (30) days from the date of this order, and she shall within such time provide the husband with a fully executed release, in recordable form, of any lis pendens or liens she may have placed thereon.
 4. The wife shall have exclusive possession of the real property located at 45 Meyer Place, Greenwich, Connecticut, and she shall retain sole title thereto free and clear of any claims by the husband, including the existing mortgage of record. The husband shall within thirty (30) days from the date of this order shall provide the wife with fully executed release, in recordable form, of any lis pendens, mortgage, or liens he may have placed thereon. Except as otherwise set forth herein, this transfer is by way of a lump sum satisfaction of the claims of the wife to an equitable division of the marital estate.
5. Personal property shall be divided as follows: CT Page 10735
 A. The home furnishings acquired during the marriage (except through inheritance) shall be divided as nearly equally as possible. In the event that the parties are unable to agree upon a division, the issue is hereby referred to Family Relations for resolution and recommendation.
 B. Each party shall be entitled to keep the automobiles which they are currently driving free and clear of any claims by the other, and each party shall cooperate with the other regarding the execution of any documentation necessary to transfer and/or register same.
 C. The husband shall be entitled to keep those items that he brought into the marriage as set forth on Defendant's Exhibit P free and clear of any claims by the wife.
 D. The wife shall be entitled to keep any assets which she inherited from her mother, including cash and securities, free and clear of any claims by the husband.
 E. Each party shall be entitled to keep the balances in their respective bank accounts, including checking, savings, and money market free and clear of any claims by the other.
 F. Each party shall be entitled to keep the stocks and bonds standing in their respective names, as well as their respective investment/securities accounts free and clear of any claims by the other.
 G. The husband shall be entitled retain his interest in AHSC Architects, P.C., including the deferred compensation account, AHSC Group, LLC, and McLellan Copenhagen, LLC free and clear of any claims by the wife.
 6. The husband shall promptly notify his employer as to the change of marital status and shall cooperate with the wife in obtaining continuation health insurance coverage as provided by state and CT Page 10736 federal law. The wife shall be responsible for the payment of any premiums due for such coverage.
 7. The husband shall maintain a portion of the existing life insurance in a minimum amount of $250,000, and shall name the wife beneficiary thereof for so long as he has an obligation to pay alimony under the terms of this decree.
 8. Except as set forth below, each party shall keep their respective retirement accounts, including pensions, IRAs, and 401(k)s, free and clear of any claims by the other. As to the husband's Fidelity 401(k) Plan: The husband shall within thirty (30) days hereof transfer to the wife the sum of $125,000 by means of a Qualified Domestic Relations Order ("QDRO") which shall be prepared by the attorney for the wife. The wife and her attorney shall be entitled to any and all information regarding the Plan necessary to the preparation and filing of the QDRO, including, but not limited to prior and current balances and prior account activity. No withdrawals, distributions, or transfers shall be made regarding the Plan prior to this transaction except as consistent with this order. The Court shall retain jurisdiction to deal with any issues which may arise with regard to the preparation and filing of the QDRO.
 9. Except as otherwise set forth herein, the parties shall each be responsible for the debts as shown on their respective financial affidavits, and they shall indemnify and hold each other harmless from any further liability thereon.
 10. Within thirty (30) days from the date hereof, the husband shall pay to the attorney for the wife the sum of $25,000 as and for a portion of her attorneys fees and costs incurred herein, and the wife shall be responsible for any sums due and owing in excess thereof
 11. The Court hereby orders an Contingent Wage Withholding Order pursuant to Section 52-362 C.G.S. in order to secure the payment of the alimony CT Page 10737 order.
THE COURT
SHAY, J.